IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PRISCELLA GANT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 12 C 4090 |
| v. ) | |
| ) | Magistrate Judge |
| MICHAEL J. ASTRUE, ) | Maria Valdez |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Priscella Gant's ("Gant" or "Claimant") claim for Disability Insurance Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Gant's motion for summary judgment [Doc. No. 16] is granted in part and denied in part and the Government's motion for summary judgment [Doc. No. 18] is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings.

**BACKGROUND**

**I. PROCEDURAL HISTORY**

Gant originally applied for Disability Insurance Benefits as a disabled widow on April 28, 2010, alleging disability since March 1, 2006. (R. 54) Her application

was denied initially on June 29, 2010, and upon reconsideration on April 15, 2011. (*Id.*) Gant filed a timely request for a hearing by an Administrative Law Judge ("ALJ"), which was held on November 14, 2011. (*Id.*) Gant personally appeared and testified at the hearing and was represented by counsel. (*Id.*) A vocational expert also testified. (*Id.*)

On January 23, 2013, the ALJ denied Gant's claim for benefits and found her not disabled under the Social Security Act. (R. 66.) The Social Security Administration Appeals Council denied Gant's request for review (R. 1-3), leaving the ALJ's decision as the final decision of the Commissioner and therefore reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. FACTUAL BACKGROUND

### A. <u>Background</u>

Gant was born on July 28, 1956. (R. 22.) She worked as a dental assistant in the early 1990s, and after a hiatus, she worked as a health care assistant in 2000-01, then worked as a cook in a nursing home from February 2004 through February 2006, while also working as a cook at an elementary school for six months between 2004 and 2005. (R. 147.) As a nursing home cook, she indicated that she would "sanitize, cook, prep and serve" meals to 250 residents and staff. (R. 164.) The job also required lifting roughly 30-40 pounds occasionally and 15-20 pounds frequently. (*Id.*) As a school cook, Gant wrote that her job required her to sanitize the counter top and prepare, cook, and serve meals. (R. 166.) She had to

2

occasionally lift 75-80 pounds and frequently lift up to fifty pounds. (*Id.*) She said that she was laid off on February 28, 2006, and that her condition became severe enough to keep her from working on March 1, 2006. (R. 146.)

In her application, Gant listed arthritis in her hands and arms as the condition that limited her ability to work. (R. 145.) She indicated weakness in her hands and arms that made it difficult to perform household tasks such as lifting kitchen tools, opening jars or packages, and carrying baskets or groceries. (R. 152.) The more she used her hands and arms, the more painful they became. (R. 154.)

In her appeal form, Gant included ankle swelling and neck stiffness among her limitations, in addition to hand and arm fatigue. (R. 173.) The Office of Disability Adjudication and Review included hypertension, obesity, edema of the lower extremities, and degenerative arthritis into account when reviewing the denial of her application. (R. 193.)

### B. Testimony and Medical Evidence

#### 1. *Gant's Testimony*

Gant testified that her main limitation for the last two years was pain and weakness in her left hand and arm. (R. 24-25.) She reported no problems with her right hand and arm. (R. 25.) She testified that she could reach her arm up front or overhead, but only with pain. (R. 27.) Gant hypothesized that she may have hurt the arm from the lifting required in her most recent job. (*Id.*) She moved in with her daughter in September 2011, and now her daughter does all the household cooking, cleaning, laundry, and grocery shopping. (R. 32.) Gant previously did some of those

3

tasks herself while living on her own, although occasionally her daughter came over to help, and Gant appeared to state that in fact she only did the mopping herself and left the rest for her daughter. (R. 33.) She takes prescription nitroglycerin pills for pain as needed, sometimes once a day and, on bad days, two or three times. (R. 37.) She reported that she typically had "bad" days roughly three or four days out of the week. (R. 38.)

Gant also reported constant swelling of both her ankles, which could be relieved by elevating her legs. (R. 28-29.) She said she elevated her legs frequently, for a couple hours at a time, several times per day. (R. 30.) On bad days, she could still walk on them, but only for short periods interspersed with rest. (R. 39.)

In addition to the work reported on her application, Gant testified that she worked for short stints (fewer than eight weeks) at a job in 2008 and another job in 2009. (R. 24.)

### 2. *Medical Evidence*

Dr. Liana Palacci performed a consultative examination of Gant in June 2010 and diagnosed obesity, while noting the claimant's complaints of bilateral hand pain with no objective findings. (R. 210.)

Dr. Lisa Richardson had treated Gant for roughly one year prior to completing a residual functional capacity questionnaire in June 2010. (R. 212.) She diagnosed hypertension, a possible rotator cuff tear, and coccyx pain. (R. 213.) Dr. Richardson found that Gant could continuously stand for one to two hours, could continuously sit for less than twenty minutes, and that sitting for long periods of

4

time caused "excruciating" pain. (*Id.*) She further found that Gant could lift and carry between ten and twenty pounds, but had pain in her knees when kneeling or squatting. (R. 214.) She also diagnosed chronic arthritis, which could make movement difficult or painful. (R. 215.)

Dr. Frank Jimenez performed an initial determination in June 2010, denying Gant's claim based on his findings of bilateral hand pain with no objective findings, obesity, normal ambulation, and the ability to perform fine and gross manipulations with both hands. (R. 216-18.) Dr. David Mack did the reconsideration of that determination in April 2011 and affirmed the findings of Dr. Jimenez. (R. 261.)

Dr. Fauzia Rana performed a consultative examination in March 2011, diagnosing high blood pressure that was controlled, possible degenerative arthritis, and a history of carpal tunnel syndrome. (R. 253.) Dr. Rana found Gant to be able to sit, stand, speak, and hear without difficulty, but found she had joint pain that made it difficult to walk, lift, or carry. (*Id.*)

Dr. Payman Sattar examined Gant in December 2011 and found joint pain, noted that the claimant reported radiating chest pain that was getting worse, and noted exacerbating factors of emotional stress, exertion, and movement. (R. 312.)

### 3. *Vocational Expert's Testimony*

The vocational expert (VE) testified that for a person of Gant's age, education, and work experience, with the residual functional capacity to perform skilled, light work, she could work in one of the 3,800 food prep jobs in the region. (R. 43.) Of those food prep jobs, 2,800 would qualify as semi-skilled work. (*Id.*) With

5

the capacity to lift and carry fifty pounds occasionally and twenty five pounds frequently, to stand or walk for six hours and to sit for six hours in an eight-hour workday, to reach in any direction frequently with her non-dominant arm, and to engage in frequent handling or fingering, the person could do Gant's past relevant work. (R. 43-44.) If the person were limited to only occasional reaching with her non-dominant arm, however, she could not perform Gant's past relevant work. (R. 44.) But the person could perform other jobs that exist in the regional economy, including as a receptionist (3,000 light, unskilled jobs), cashier (31,300 jobs), or cafeteria worker (2,700 jobs), all of which required only light work: lifting twenty pounds occasionally and ten pounds frequently. (R. 44-45.) The same person—limited in the use of her non-dominant arm—could work as a semi-skilled or unskilled food prep worker, according to the VE, (R. 45), although it wasn't clear whether this overlapped with the cafeteria worker position. If the person had to elevate her legs for several hours per day, it would rule out all jobs. (R. 46.)

### 4. *Gant's Post-Hearing Vocational Analysis*

Gant, through her attorney, submitted a vocational analysis by James Breen two weeks after the hearing before the ALJ. (R. 318.) Breen based his findings on a phone interview with Gant, in which she described her prior work, as well as on her medical records from Drs. Palacci, Richardson, and Rana. (R. 319.) He found that Gant could be found disabled under multiple medical-vocational rules, on the basis of her lack of transferable skills to sedentary or light occupations, inability to stand for six hours, and need to elevate her legs. (R. 320.) Breen described himself as a

6

vocational rehabilitation expert and indicated that he was paid a fee to produce the analysis, but that the referral source did not influence his conclusions. (R. 320.)

## C. ALJ Decision

The ALJ found that Gant had not engaged in substantial gainful activity since her initial onset date of March 1, 2006, which is within the prescribed period for disabled widow's benefits in her case, which ends January 31, 2014. (R. 54, 56.) The ALJ also found that Gant had severe impairments of polyarthralgia of the upper and lower extremities and obesity. (R. 57.) The claimant had also alleged disability due to hypertension, but the ALJ found that this condition was well controlled and therefore not severe. (*Id.*) The ALJ stated that none of the impairments, alone or in combination, met or medically equaled any listing of impairments. (*Id.*)

The ALJ next determined that Gant had the RFC to perform light work, clarifying that this meant she could lift up to twenty pounds occasionally, lift up to ten pounds frequently, stand or walk for six hours in an eight hour workday, sit for six hours in a workday, engage in occasional reaching with the left upper extremity, and engage in frequent bilateral handling and fingering. (R. 58.) The ALJ relied in part on Gant's report of her activities of daily living, which he found did "not reflect significant limitations." (*Id.*) Among other activities, he noted her ability to do laundry, drive a car, go shopping, go to church, visit friends and family, cook and clean up after meals, and sit for at least two hours but take periods of rest. (R. 58-59.) The ALJ also found that while Gant claimed disability since March 2006, the

7

medical history only supported a finding of impairments starting in October 2009, when she first sought treatment and her doctor indicated that she appeared healthy. (R. 59, 61.)

The ALJ generally found that Gant's medical history did not support her claims of disability. For "at least" the period from March 2006 through October 2009, she "certainly did not receive the type of medical treatment one would expect for a totally disabled individual." (R. 61.) The lack of evidence of physical therapy—suggesting that Gant did not seek such therapy after receiving her doctor's referral—also indicated to the ALJ that her symptoms were not as severe as she alleged. (*Id.*) And her reliance on over-the-counter pain relievers rather than narcotic-based medications was further evidence that her condition was not severe. (*Id.*) As for the medical evidence, the ALJ found no indication that Gant was unable to work. (R. 63.) The ALJ largely rejected Dr. Richardson's opinion, finding it vague and conclusory, lacking in a function-by-function analysis, and appearing to be sympathetic to the claimant. (*Id.*) But the ALJ accepted one aspect of Dr. Richardson's opinion: that the claimant did not have to rest more than fifteen minutes, lie down, or elevate her legs during the day. (*Id.*) The ALJ accorded some weight to Dr. Jimenez and Dr. Mack, the two state agency medical consultants, both of whom found Gant's impairments to be non-severe. (R. 63-64.) The ALJ nevertheless noted that he found her impairments to be severe (just not disabling). (R. 64.) He also "considered" the opinion of Dr. Rana in reaching his conclusion. (*Id.*)

8

The ALJ noted two other inconsistencies that led to his finding that Gant's self-reporting was not credible to the extent it conflicted with the medical evidence. Firstly, in a memorandum in support of her disability claim, Gant reported that she was "currently self-employed" in her home (but did not take any compensation), and four days later at her hearing she denied that she was currently working. (R. 62.) Secondly, she applied for state unemployment benefits, which require an affirmation that the applicant is "ready, willing and able to work," after the alleged onset date of a disability that she says prevents her from working. (*Id.*)

Finally, the ALJ concluded that while Gant could not perform her past relevant work, she had acquired various skills from her past work as a nursing home cook and school cook. (R. 64.) Relying on the *Dictionary of Occupational Titles* ("*DOT*"), the ALJ found that these skills included "preparing food for human and animal consumption; basting; boiling; brewing; churning; curing; flavoring; frying; heating; kneading; measuring; pasteurizing; pickling; rendering; roasting; rolling; seasoning; spreading; and squeezing." (*Id.*) The VE then testified that those skills would allow one to work in semi-skilled food prep, in one of 2,800 jobs in the region. (R. 65.) The ALJ found that the *DOT* also identified a variety of light and semi-skilled jobs utilizing those same skills. (*Id.*) "According to Social Security Ruling 82-41, the claimant's skilled job duties of her past work are very closely related to these jobs," the ALJ wrote, and therefore "it is expected that the claimant could perform these other food prep jobs" proficiently with minimal training. (*Id.*) Furthermore, the VE testified that the semi-skilled food preparation jobs could be

9

performed with frequent use of one arm and only occasional use of the other arm. (*Id.*) The ALJ accorded great weight to the VE's testimony. (R. 66.) The ALJ merely accorded "due consideration" to the Vocational Analysis performed by the claimant's own expert, because it was submitted after the hearing (and therefore was not under oath), was based on the opinion of Dr. Richardson that the ALJ largely rejected, and was generated by an expert who was being paid by the claimant's attorney. (*Id.*) In light of her transferable work skills, and despite her limitations, the ALJ found that Gant was not disabled. (*Id.*)

## DISCUSSION

### I. ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning

11

behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *see also Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III. ANALYSIS

Gant argues that the ALJ decision was in error because the ALJ: (1) did not base his Step Five finding of Gant's work skills on substantial evidence; (2) relied on post-hearing vocational evidence without a proffer to Gant; and (3) improperly assessed Gant's RFC by failing to account for her need to elevate her legs.

### A.     <u>RFC Assessment of Claimant's Work Skills</u>

Gant argues that in his Step Five analysis the ALJ failed to identify the specific skills that Gant actually acquired in her past relevant work, and in addition that the ALJ failed to elicit testimony about the number of available jobs for the positions that he did find to be available. At Step Five, where the ALJ finds that the claimant has transferable work skills, the ALJ must identify the "acquired work skills" and the specific occupations to which they may be transferred. SSR 82-41. At certain points in his analysis, the ALJ is permitted to look to publications such as the *DOT* to determine the general job description and skills required for a position. However, the ALJ must "identify work skills *actually acquired*" by the claimant "that would enable her to perform as he indicated, given her residual functional capacity and work experience." *Key v. Sullivan*, 925 F.2d 1056, 1062-63 (7th Cir. 1991) (emphasis in original); *see also Abbott v. Astrue*, 391 F. App'x 554, 558 (7th Cir. 2010) ("Relying on S.S.R. 82–41, courts have vacated judgments in disability cases in which the ALJ failed to identify the claimant's acquired work skills or to make specific findings about the transferability of skills and those findings were material to the outcome.") Remand is appropriate when "the vocational expert. . . failed to testify that [the claimant] had in fact acquired skills that were transferable." *Key*, 925 F.2d at 1062.

The ALJ in this case failed to properly articulate Gant's actually acquired skills at Step Five, which requires a remand. The ALJ identified the skills that Gant acquired in her previous work based on the description of her previous job

13

titles in the *DOT*, but did not seek any input from the VE on the skills that the claimant had acquired nor did he base his findings on the actual work that Gant did in her jobs. (*See* R. 65.) He merely told the VE the claimant's previous job titles, on which basis the VE named at least one representative occupation–semi-skilled food prep worker, with 2,800 jobs–that existed in significant numbers in the regional economy. (*Id.*) Then the ALJ identified several other jobs that fit the same set of skills, based on the *DOT*, but identifying no number of such jobs in the regional economy. (*Id.*) The ALJ's list of job titles without any corresponding numbers of such jobs in the regional economy is not sufficient "evidence that these specific skilled or semiskilled jobs exist," and thus does not "clearly establish the basis for the determination" and cannot be accorded any weight by this Court. SSR 82-41. And while the existence of 2,800 semi-skilled food prep worker positions is sufficient to show the availability of work, *see Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) ("it appears to be well-established that 1,000 jobs is a significant number"), it is not clear that Gant could *actually do* the work. The VE identified a position on the basis of the ALJ reading the standard job description for Gant's past work from the *DOT,* as opposed to finding her actually acquired skills via the VE or based on Gant's own representation. We must remand so that the ALJ can properly articulate the actually acquired skills of the claimant at Step Five before finding

14

that such skills are transferable to jobs in the regional economy. *See Key*, 925 F.2d at 1062-63.[1]

### B. Reliance on Evidence Obtained Post-Hearing

Gant argues that the ALJ erred in relying on evidence obtained post-hearing without making a proffer to Gant. In particular, she argues that the ALJ's use of the *DOT* to determine the claimant's acquired job skills (as discussed in part A above) and to identify additional jobs that utilize those same skills, (*see* R. 65), without proffering the evidence to her violated both agency regulations and Gant's due process rights. The *Hearing, Appeals, and Litigation Law Manual* ("*HALLEX*") is a publication of the Social Security Administration that "conveys guiding principles, procedural guidance, and information to Office of Disability Adjudication and Review Staff." *HALLEX*, I-1-0-1, PURPOSE, http://www.ssa.gov/OP_Home/hallex/I-01/I-1-0-1.html (accessed August 14, 2013).[2] The *HALLEX* requires that the ALJ proffer any posthearing evidence to the

---

[1] The ALJ also listed several other job titles from the *DOT* that required similar skills as the ones he found listed for Gant's previous work. Gant argued that this was error. A better description is that this effort was entirely useless: listing job titles, without any indication of the number of such jobs available in the regional economy, does not indicate whether the claimant's RFC allows her to find work. Since at least one job title did include a sufficient number of jobs in the regional economy, this did not constitute reversible error, as noted above. However, on remand, the ALJ should not only determine Gant's actually acquired skills from her past work, but, to the extent he intends to rely on the *DOT* for jobs that fit those skills, he must determine the number of those jobs in order to determine whether she may be expected to find work.

[2] Gant argues, and the government does not dispute, that *HALLEX* is binding on ALJs under the *Auer* doctrine requiring deference to an agency's reasonable interpretation of its own regulations. (Pl.'s Mot. at 10-11 n.4, *citing Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *see also Oyen v. Shalala*, 865 F.Supp. 497, 505-06 (N.D. Ill. 1994) (requiring ALJ to proffer evidence according to *HALLEX* requirements).

15

claimant (unless the claimant submitted the evidence herself, waived her right to examine it, or will be issued a fully favorable decision) and give the claimant time to respond. *Id.*, PROFFER PROCEDURES, I-2-7-30; *Oyen v. Shalala*, 865 F.Supp. 497, 505-6 (N.D. Ill. 1994) ("the ALJ must proffer [additional posthearing] evidence by way of a letter" to claimant). The government argues that the *DOT* job descriptions were not new evidence in the case. It is true that the ALJ may take administrative notice of the *DOT* for information regarding general job description information, *see* SSR 82-61, but in this case the ALJ erroneously relied on the *DOT* for the information regarding Gant's actually acquired job skills in Step Five, which is a separate inquiry and not appropriate for administrative notice.

The ALJ failed to proffer the *DOT* evidence regarding Gant's actually acquired work skills to the claimant, which was an error. This must be remedied on remand if it arises, although it may be a moot point on remand based on this Court's ruling in part A above. The ALJ must follow the proper procedures to find and articulate Gant's acquired skills; by doing so in a hearing with a VE, and giving the claimant an opportunity to cross-examine the VE or otherwise participate in the hearing, the ALJ will satisfy the Step Five requirements and render the issue of posthearing evidence a moot point. In the absence of a hearing, however, the ALJ must proffer any new evidence to Gant, pursuant to the *HALLEX* requirements.

    C.    <u>**Claimant's Need to Elevate Her Legs**</u>

Gant argues that the ALJ's decision to include no accommodation for Gant's edema nor for her alleged need to elevate her legs was neither sufficient nor logical.

16

She points to her own testimony, which the ALJ discounted as lacking credibility, and also to Dr. Richardson's opinion, which the ALJ generally discounted as to everything else but accepted as to the claimant's having no need to elevate her legs. The Court must first examine the ALJ's reasons for finding the claimant to lack credibility (which Gant does not directly challenge), and then review whether the ALJ was justified in omitting Gant's leg issues from the RFC assessment.

An ALJ's credibility determination receives substantial deference on review unless it is patently wrong and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir. 2003). The ALJ must give specific reasons for discrediting a claimant's testimony, however, and the reasons must find support in the record and be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski*, 245 F.3d at 887-88. In this case, the ALJ offered multiple reasons for finding a lack of credibility: Gant's medical history did not support her claims of disability (R. 61); Gant reported that she was "currently self-employed" in an application and at her hearing four days later denied currently working (R. 62); and she applied for state unemployment benefits, affirming that she was "ready, willing and able to work," after the alleged onset date of her disability. (R. 62.) Gant does not challenge the credibility assessment, and the reasons noted by the ALJ are supported by the record and require this Court's deference.

17

Gant, without disputing the ALJ's credibility finding, nevertheless argues that the ALJ must indicate how his credibility finding affected his evaluation of Gant's lower leg problems. (Pl.'s Mot. at 13 n.5.) ("Did he, for instance, believe that it did not happen at all, or did he believe that it did not happen as frequently as she alleges?") The ALJ's analysis must provide "some glimpse into the reasoning" behind his decision, *Zurawski*, 245 F.3d at 889, but this only requires a minimal articulation and not necessarily a lengthy discourse. *See Boiles*, 395 F.3d at 425. The ALJ barely met that standard in this case. He justified his finding that the claimant lacked credibility, and while he did not explicitly attach a level of credibility to Gant's claims of leg pain, Gant did not point to any authority that such a specific enunciation is required of an ALJ. On its own, this would not require a remand. Given that the case will be remanded for other reasons, however, the ALJ should take that opportunity to better articulate whether he gave any credence to Gant's claims of leg pain and, if so, how much.

Gant also argues that the ALJ erred by applying different amounts of weight to different aspects of Dr. Richardson's opinion: the ALJ applied not even significant weight to the bulk of her opinion, but accepted her opinion that Gant did not need to rest more than fifteen minutes, lie down, or elevate her legs during the day. (R. 63.) The ALJ "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. In this instance, the ALJ offered several reasons to discredit Dr. Richardson's opinion: it lacked a function-by-function analysis; it was vague and conclusory; and it was not supported by the doctor's own

18

clinical or laboratory findings. (R. 63.) This justifies discounting the opinion entirely, but to cherry-pick the one aspect of the opinion that supports a not-disabled finding is not logical. *See id.; cf. Zurawski*, 245 F.3d at 888 (ALJ cannot mention only evidence that supports her decision and ignore lines of evidence contrary to her findings).[3] Gant is therefore correct that the ALJ failed to sufficiently justify this split analysis. On its own, however, this would not be reversible error: the ALJ had several other medical opinions—those of Dr. Jimenez, Dr. Mack, and Dr. Rana—on which to rely in finding that the claimant did not need to elevate her legs. (*See* R. 63-64.) Nevertheless, on remand, the ALJ should remedy this deficient analysis of Dr. Richardson's opinion and the ultimate conclusion that Gant did not require leg elevation, as described above.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Priscella Gant's motion for summary judgment [Doc. No. 14] is granted in part and denied in part and the Government's motion for summary judgment [Doc. No. 18] is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this order.

---

[3] The ALJ also noted the concern that Dr. Richardson, as a treating doctor, may have been influenced by her sympathy for the claimant. (R. 63.) While this offers a justification for discounting her opinion where it veers towards too many physical restrictions but not too few, the ALJ made clear that he viewed her entire opinion as unreliable and flawed. To accept only one aspect of the opinion comes too close to cherry-picking for comfort.

19

SO ORDERED.                                    ENTERED:

DATE:   <u>August 20, 2013</u>                 _____
                                               **HON. MARIA VALDEZ**
                                               **United States Magistrate Judge**